[No. 39045.    Department One.    June 1, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. NATHANIEL LEON
GREEN, *Appellant*.*

*Reported in 428 P.2d 540.

*McGavick, Betzendorfer, Hemmen & Bottiger,* by *M. H. Hemmen,* for appellant (appointed counsel for appeal).

*Ronald Hendry, Everett K. Plumb,* and *Joseph D. Mladinov,* for respondent.

HALE, J.—█ No matter how devotedly the courts strive for perfection, it is bound in some degree to elude them. The perfect trial probably is yet to be held. Therefore, an appeal by an inevitable process of intellectual distillation reduces the points under review to a question of whether the flaws in the record are of sufficient moment to mark the trial as unfair. In the last analysis, the final measure of error in a criminal case should be: Was the defendant afforded, not a perfect but, rather, a fair trial?—for the constitution guarantees no one a perfect trial.

It was 10 minutes before midnight in Tacoma, March 10, 1966, and the department had shifted two detectives from the robbery detail to the night burglary detail. As Detectives William Luebke and Richard Six sat in the unmarked car, the police radio told them that a burglary was in progress at the Medical Center Pharmacy three blocks away. With Officer Luebke at the wheel, the two officers sped to the pharmacy, coasting to a stop within 30 feet of the pharmacy's rear entrance with the car lights and motor off. So great had been their speed when he turned off the motor that Detective Luebke applied the emergency brake for a quick stop, making the tires squeal. Both officers jumped from the car before it halted just in time to see three men run from the back door of the pharmacy.

Officer Luebke, drawing his revolver, shouted, "Halt, Police," but the three men broke and ran. He fired two shots in their direction and the three separated. As he ran after them, the officer got a good view of one of them. He could see that he was tall, slender, wearing dark pants, and a black leather jacket of fingertip length resembling a suit coat. When the man in black turned a corner with Officer Luebke in pursuit, the policeman lost sight of him for a few moments. Calling to a service station attendant across the

street, "Which way did he go?" the officer heard the reply, "Up the drive." By then, the detective noticed that two police prowl cars and a patrol wagon had arrived and other policemen were combing the area.

The fleeing man stayed out of Luebke's sight for 10 or 15 seconds until Luebke caught sight of him again running down M Street toward 11th. Leaving a number of men in pursuit, the detective returned to the pharmacy to examine the scene of the burglary.

In the meanwhile, Officer Robert Lewis and his partner, Harry Hanson, cruising nearby in the patrol wagon, a few minutes before midnight received a radio call directing them to the Medical Center Pharmacy a few blocks away. Turning their car onto 11th at K Street, they saw a man one and one-half blocks away running across 11th Street in a westerly direction away from the pharmacy location. He was dressed entirely in black.

They followed in the patrol wagon and overtook him but, when they were within 20 feet of him, he ran around the corner of a savings and loan building. Describing the pursuit, Officer Hanson said that, as defendant turned the corner, he disappeared like magic. The officers, pursuing on foot, knew that the man they followed could not have made it to the next corner of the structure, so they searched some low, thick shrubbery to the southwest of the building. Officer Hanson discovered the defendant lying there spread-eagled in the shrubs.

Defendant was wearing a black leather jacket, black slacks, black shoes and, on his right hand, a black rubber glove. When the officers took defendant up out of the shrubbery, they observed a buckskin glove lying underneath him.

Other evidence made out a strong case against defendant. His fingerprints were found on the light globe which illuminated the pharmacy's rear entrance, but the globe had been loosened in its socket to leave the entrance in darkness. His fingerprints were also discovered on the light bulb's glass shield found in a garbage can near the phar-

macy back door. Further, defendant admitted riding in the automobile with the other two men involved in the burglary to the vicinity of the pharmacy's rear entrance, and acknowledged his flight from the police with them.

Defendant denied, however, that he participated in any way in the burglary or that he knew his companions intended to break into the place. He testified that he came to Tacoma with the other two men, Gaither and Wilkerson, that evening from Seattle to rehearse for a musical audition they were planning to make. He said that he, Gaither and Wilkerson were in the car when it was driven by one of them up into an alley behind the pharmacy. According to defendant, the other two men got out of the car while he, not knowing their purpose or intended course of action, waited in it. He said that he stayed in the car for about 5 minutes after they had left, and then, becoming increasingly concerned about their absence, got out of the car to see what they were up to. As he turned a corner, he came upon one of them standing in a doorway near an open door and asked him (Gaither) what he was doing; Wilkerson then came out of the building and asked the defendant to hand him the light bulb and shield. He relates that Wilkerson told him, "We are already in the place, might as well go ahead and hit it."

Defendant testified that he picked up the light bulb shield and light bulb from the ground and handed them to Wilkerson, but that, after doing so, he volubly protested for about 5 minutes as to what they were up to. Then, as he turned to walk away from them and the pharmacy, he heard the prowl car's tires squealing, saw the officers' flashlights beam toward him and ran away. His account of the pursuit and his capture in the shrubbery coincides with that of the officers.

Abundant evidence proved that the pharmacy window had been pried open and the place burglariously entered; tools suitable for a forced entry were found nearby. The record establishes a strong case from which the jury could readily find the defendant guilty of burglary in the second degree. It remains to be decided, however, whether the conviction was, nevertheless, unfairly obtained.

Defendant claims reversible error when the prosecution impeached state's witness Gaither, an admitted participant in the burglary. It came about in this way: Charles Gaither, called by the state in its case in chief, testified at the outset that he had participated in the Medical Center Pharmacy burglary on the night of March 10th; then he testified:

Q. All right. I will ask you whether or not the Defendant Nathaniel Leon Green participated with you and aided you in the commission of that burglary? A. No.

He repeated this negative answer after a lengthy colloquy in the jury's absence, and the state, claiming that Gaither had made earlier statements inconsistent with the exonerating testimony, sought to impeach him.

The prosecuting attorney had not interviewed Gaither before trial, nor otherwise ascertained if he intended to contradict the statement. On receiving from the state's witness the exculpatory answer that the defendant was innocent, the state claimed surprise and unexpected hostility from the witness, and laid a foundation for impeachment by establishing that the witness had earlier made a written statement describing the crime and incriminating defendant as an accomplice. When shown this confession on the stand, Gaither denied that the written statement referred to the defendant, Nathaniel Leon Green, asserting that it referred to another man variously mentioned in the statement as Green, Nathaniel, or Nat.

Having thus laid a proper predicate for impeachment by first showing that Gaither denied having incriminated defendant in his confession and meant a different person, the state then impeached the witness through the testimony of a police officer who testified that, throughout the entire statement-taking process, both orally and when reducing it to writing, the witness, in referring to a *Nat, Nathaniel* or *Green* at all times identified and referred to the defendant, Nathaniel Leon Green, and at no time indicated in using those names that he meant any person other than defendant. Gaither's confession was not offered in evidence. Impeachment consisted only of the officer's recital of Gaither's

statements concerning defendant's participation in the burglary.

Several times during the laying of the foundation for impeachment and before accepting the police officer's impeaching testimony, the learned trial judge cautioned the jury that the evidence they were hearing pertaining to the Gaither confession was offered for impeachment and to affect Gaither's credibility as a state's witness only, and that the jury were not to regard such impeaching evidence as proof of the truth of anything asserted in the statements. Additionally, through instruction 21, the court fully instructed the jury concerning the limited function and purposes for which the impeaching testimony of Charles Herman Gaither had been received.

Thus, the assignment of error focuses directly on the questions of surprise and hostility. Could the prosecuting attorney legitimately claim surprise when he had not interviewed Gaither, nor otherwise made inquiries as to whether he would adhere to his statement concerning the defendant?

Expressed differently, did the prosecuting attorney have a reasonable basis for relying on the statement when he called Gaither as a witness in the state's case in chief? Defendant argues that surprise could not be fairly or reasonably claimed as basis for impeachment and that the prosecuting attorney, knowing of Gaither's participation in the crime, was bound to anticipate his reluctance to testify against an accomplice and was obliged to question him before calling him as a witness. He urges that a contrary ruling enabled the state to get parts of Gaither's incriminating statement before the jury under the guise of impeachment.

The test for impeachment in this instance is whether the claim of surprise was genuine, for the hostility of the witness became evident at the outset of his direct examination. Surprise depends largely on whether the party calling a witness has a reasonable belief that the statements made by the witness to investigating officers were intended by the witness to be accepted as true. If it appears from all of the circumstances that the prosecuting attorney did not

know and had no reason to assume that the witness would repudiate his prior statements, the state's claim of surprise is well taken.

One of the basic obligations resting on everyone living under the protection of our constitutions is that, when called upon to give evidence in court he will, without reservation, speak the truth; that he will not avoid or evade this duty through fear, malice, or hope or promise of reward. The court and every party to a judicial proceeding—indeed, society itself—has a right to assume that the duty to give truthful evidence will be discharged and it need not be anticipated that that duty will be betrayed. Thus, the law—with several notable exceptions, of course—assumes that a party calling one as a witness not only believes the witness to be truthful, but represents him to be truthful. One is thus held to vouch for the credibility of the witnesses he presents. Having called the witness to testify and thereby vouching for his truthfulness—although he may present other evidence of a contradictory nature through other witnesses—a party may not impeach his own witness unless without warning the witness tells a story different from the one the party calling him had a reasonable right to expect of him.

But what if the party's faith in his witness is betrayed?

The law has a protective device for this betrayal through a corollary rule which allows a party to impeach his own witness in event of genuine surprise and hostility. Both the rule as to credibility and impeachment are essential to elicit the truth. If one were not held to vouch for the credibility of witnesses called by him, he could present one lying witness after another in the hope of establishing facts favorable to his cause. Contrarily, if there were no exception or corollary to this rule, a party to a judicial proceeding would be left in a position of hopeless betrayal by a witness upon whom he had good reason to rely and for whose credibility he had vouched.[1]

---

[1] Of course, a proper foundation must be laid in order to impeach one's witness. The party must first show that he has been taken by surprise and that the witness is hostile. 1 Underhill, Criminal Evidence § 232 (5th ed. 1956).

At the time the state called Gaither, the prosecuting attorney had in hand a detailed statement of the crime signed by Gaither and describing defendant as one of two accomplices. Made by the witness without duress, coercion or fear, the statement recited at firsthand Gaither's and his accomplices' step-by-step participation in the burglary, and corroborated in detail the mass of other evidence which the prosecuting attorney intended to offer in the state's case in chief. Gaither had never, to the prosecuting attorney's knowledge, repudiated the statement nor had he ever intimated to the prosecuting attorney at any time before being put on the witness stand that he intended to do so.

Where investigating officers, whose duty it is to seek, find, preserve and analyze evidence of criminal offenses and turn it over to the prosecuting attorney for ultimate legal action, have furnished the prosecuting attorney with formally prepared, signed or acknowledged statements of witnesses, the prosecuting attorney may rely on these statements and is under no duty to reinvestigate the case unless he possesses other information which reasonably apprises him that the statements were false or that the witness making them intends to repudiate them.

Gaither's acknowledged guilt did not absolve him from his duty to give truthful evidence. Because he was present before, during and after the burglary, knew at firsthand what his accomplices did and said, saw their flight from the pharmacy, and generally had more specific knowledge of the crime perhaps than anyone except his accomplices, his statement under oath to the jury that the defendant did not participate in any way in the commission of the crime was damaging indeed to the state and correspondingly favorable to the defendant. The prosecution had a right to undo this damage by attempting to impeach the witness and thus cancel the effect of this surprisingly hostile testimony. The court properly allowed the impeachment. *State v. Fry*, 169 Wash. 313, 13 P.2d 491 (1932).

*State v. Thorne*, 43 Wn.2d 47, 260 P.2d 331 (1953), cited by the defendant, we think inapplicable for that case in-

volved the testimony of a 10-year-old girl, and we held it unlikely that counsel would call her as a witness without first discussing her testimony with her.

Defendant directs his second assignment to two remarks of the prosecuting attorney couched in the form of questions on cross-examination. Defendant says these remarks, despite the want of request for a curative instruction or admonition, were so studied and flagrant and of such cumulative effect as to make a curative instruction pointless because they placed defendant in a position of indicating that either he or the officers were lying. On cross-examination, defendant testified that he had been out of prison 5 or 6 months before the burglary; that he worked as a dry cleaner and also with the merchant marine, but that his last job had been with an establishment known as Esquire Cleaners during late February or early March. The prosecuting attorney then asked him the first of the two challenged questions, "As a matter of fact, Mr. Green, your occupation is burglary?" to which the court promptly sustained an objection.

The question was obviously argumentative, improper, and uncalled for by the other evidence, but, in the light of defendant's revelation on both direct and cross-examination as to his criminal record including two burglary convictions, one parole revocation and possibly a probation revocation, it did him no measurable harm and could not be said to jeopardize his defense.

The other remark claimed as error occurred just a few seconds later. In the state's case, police officers had testified that, when they captured the defendant, he was wearing one black glove and that they found a buckskin glove beneath him in the shrubs. Following is the cross-examination in which the offending remarks took place:

Q. What kind of gloves were you wearing when you were arrested, Mr. Green? A. Black gloves. Q. Both gloves? A. Yes. Q. And the officers were mistaken when they said one was black and one was a pigskin glove? A. I'm sure they were. Q. Or lying. As a matter of fact, Mr. Green, if I believe your testimony, we have

to—Mr. Hemmen: I object. The Court: Sustain the objection. Counsel, I will have to ask you not to continue this line of questioning. This conduct, we will have no more of it.

Here again the query was argumentative, impertinent, and uncalled for, but the court promptly sustained an objection to it and admonished counsel to desist. Defendant, apparently regarding the incident as of trifling consequence, asked for no curative instruction.

■ In testing the degree of error engendered by the remarks, their comparative impropriety, and their likely effect upon the jury, consideration must be given to whether they were inadvertent or deliberate, designed to inflame and prejudice the jury, or whether they unintentionally may have done so. Their prejudicial or inflammatory effect must be viewed in context with the earlier evidence and the circumstances of the trial in which they were made. The error was not so deliberate, flagrant, persistent, or genuinely inflammatory as to warrant a new trial. *State v. Brown*, 35 Wn.2d 379, 213 P.2d 305 (1949); *State v. Harold*, 45 Wn.2d 505, 275 P.2d 895 (1954); *Nelson v. Martinson*, 52 Wn.2d 684, 328 P.2d 703 (1958); *State v. Griffith*, 52 Wn.2d 721, 328 P.2d 897 (1958); and *State v. Morris*, 70 Wn.2d 27, 422 P.2d 27 (1966).

Affirmed.

Finley, C. J., Hill and Rosellini, JJ., and Langenbach, J. Pro Tem., concur.