[No. 32242-7-I.   Division One.   January 24, 1994.]

THE STATE OF WASHINGTON, *Respondent,* v. BERNARD BENEDICT BOURGEOIS, *Appellant.*

---

*Mary Jane Ferguson* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *David Wall, Deputy,* for respondent.

PEKELIS, A.C.J. — Bernard Bourgeois, a juvenile, moved for accelerated review of a 290-week manifest injustice disposition imposed after he was convicted of two counts of first

degree assault. On July 20, 1993, a panel of this court accelerated review, and we now reverse.

Bourgeois, a 15-year-old, was charged with two counts of first degree assault. The charges arose from the shooting and injury of two men in the High Point area of Seattle.

Bourgeois was convicted of both counts. The juvenile court found that Bourgeois had threatened the victims, co-owners of a grocery store, earlier on the day of the incident. Bourgeois then returned, lured the victims outside, and shot them with a handgun from across the street. After the victims "managed to call 911", they were rushed to the hospital. The juvenile court found that both victims "would have died as a result of the gunshot wounds had they not received' emergency care". One of the victims had "portions of [his] pancreas, colon, and his entire spleen [removed] due to the gunshot would [sic]." Accordingly, the court found that both assaults were committed "with a deadly weapon and force and means likely to produce great bodily harm or death". On count 1, the court also found that Bourgeois "did inflict great bodily [harm]".

A disposition hearing took place on May 29, 1992. Because Bourgeois was classified as a serious offender, the standard range for each count of this offense was 103 to 129 weeks. *See* RCW 13.40.0357. The probation counselor recommended a standard range sentence on each count. The State urged a manifest injustice disposition of 130 weeks on each count. The State argued that owing to the respondent's recent criminal history and dangerousness to society, he should be confined until his 21st birthday; according to the State, only a manifest injustice disposition would ensure "confinement up to the maximum of 21".[1] The prosecutor explained that he

> spoke with a screening person about the likelihood that the respondent would receive an actual commitment of 129 weeks, were he to be given the standard, and she reported that that is most unlikely, that the vast majority of people at DJR do not

---

[1] The State initially based its disposition recommendation on the additional ground that the offenses were committed in an especially heinous, cruel and depraved manner, but withdrew this reason at the hearing.

receive the maximum, it is very rare, indeed. A person would have to act out quite uncontrollably to be held by DJR for the full range of a standard range sentence.

A lengthy colloquy ensued, during which it was explained to the court that if it imposed a standard range disposition, Bourgeois would be eligible for release, subject to the discretion of the Department of Juvenile Rehabilitation (DJR), after he had served the statutory minimum, *i.e.*, 103 weeks on each count. Both parties agreed, however, that if the court imposed a manifest injustice disposition, then the minimum sentence would be calculated at 80 percent of the specified term. The State asked the court to impose a disposition which, applying the 80 percent rule, would ensure a minimum term of confinement through Bourgeois's 21st birthday.

The court summarized this issue as follows:

> [T]he real consideration in all of this is, do we take away discretion? . . .
> . . . [I]t's a manifest injustice finding that's being asked in order to do that . . ..
> . . . [T]he adult system lets me pick a specific point in the range, and then I make the decision. Here, I just give a range, and then someone else exercises discretion. The real question is, should the Court eliminate that discretion that says it doesn't it [*sic*] trust it to be adequately used or is afraid it will be used for reasons that are not as relevant to the appropriate disposition, like maybe overcrowding or a desire to move him out.

The court sought further assurance that the criteria used by DJR to determine whether a juvenile serves the minimum or maximum would be based on "performance on his part while he was there" rather than "the egregious facts of the case". The probation officer and the prosecutor agreed that the juvenile offender's behavior at the institution determines the length of incarceration. The prosecutor added that "the vast majority of people are not held to the maximum". The court seemed satisfied at this point that "the only thing that gets him his maximum is bad behavior . . ., and that doesn't happen very often."

The balance of the argument was spent on the issue of whether the egregiousness of the victims' injuries could be

considered as a basis for a manifest injustice finding, or whether the injuries inhered in the crime of first degree assault.[2] The court concluded that, in general, personal injuries do not necessarily inhere in the crime of first degree assault, and identified the issue as whether the injuries inflicted by Bourgeois were significantly egregious enough "to take it out of what the 'norm' of assault in the first degree is and make it a basis for a more serious sentence".

In rendering its disposition,[3] the court first concluded that "[t]he assaultive character of this offense was not evident from his recent criminal history, nor does [criminal history] . . . provide much of a basis from this Court's perspective to find this case one deserving of the manifest injustice."

As for the seriousness of the injuries, the court concluded that this factor did support a manifest injustice disposition because "accountability does have to be taken into consideration and is related to the egregiousness of the consequences or results of what happened during the course of the crime." The court found that

> this is not a non-egregious case. This is a case where two men, in one event, pretty much, were separately assaulted, and both men suffered wounds which were, without treatment, capable of causing death. I speak primarily of . . . the gentleman who lost his spleen, half his pancreas, and had a colostomy. All three of those events, separately untreated, were productive of death.
>
> . . . .
> . . . It's the fact that it wasn't simply an assault of a threatened act, but it was an assault with an accomplished act with significant injuries.

---

[2]The court apparently raised this issue sua sponte, despite the State's concession that the crime was not committed in an especially heinous, cruel, and depraved manner. See footnote 1. The judge explained that "I think this is outside the concept of heinous, depraved, cruel, all that. What I'm saying is it's a category not mentioned in the statute. This is my own category that I'm arguing — these lists are not exclusive lists, and so I'm saying this is a different kind of category."

[3]No written findings and conclusions are required in support of the manifest injustice disposition. See State v. E.J.H., 65 Wn. App. 771, 830 P.2d 375 (1992). In the absence of written findings, the appellate court engages in a review of the whole record, "including the trial court's oral ruling." 65 Wn. App. at 775.

The court also stated that Bourgeois is "at this point, a serious threat to the community" and "a public danger", and noted the "serious need to intervene in [Bourgeois's alcohol and drug abuse], to provide services and treatment that can help to deal with this problem."

As additional justification for imposing a manifest injustice disposition, the court reasoned as follows:

> I am persuaded that . . . no discretionary act on the part of the agency responsible for the incarceration would in any way be related to the facts in the case, but only to his performance while in DJR, that the Court should, in fact, design the sentence that it imposes to make sure that that accountability it [*sic*] taken care of as a part of the sentence that [Bourgeois] has . . . [I]t is appropriate to limit their discretion, because of concerns for the egregiousness of the offense, factual egregiousness, as a means by which to attain the statutory obligation to hold him accountable for his behavior, and it's on that basis that the Court feels that it is appropriate to impose a manifest injustice finding.

The court utilized the same rationale in setting the length of the disposition:

> [I]t is appropriate to address the concept of duration in a way that limits discretion . . ., and since I am satisfied from the presentations in this court that nobody's going to decide that he gets 103 versus 129 based on the seriousness of the offense, but only based on his performance, I do intend to limit the discretion to some extent, of that institution that will be making those decisions.
> . . . [A]bout 116 for each of those two offenses is an appropriate nondiscretionary minimum that he should serve. The way the Court accomplishes that, however, is by making the 116 on each event be 80 percent of the actual amount imposed by the Court by way of manifest injustice, and that means he will be sentenced to 145 weeks on both counts, if his behavior is good, if discretion, as exercised by DJR, is appropriate, then he will be eligible to be released after he has served 116 weeks on each case, and it is on that basis . . . that the Court determines the duration of the manifest injustice . . ..
> So that is the sentence of the Court.

Accordingly, Bourgeois was sentenced to 145 weeks on each count, to be served consecutively, with credit for 51 days' time served. Because Bourgeois's 21st birthday is on March 18, 1997, which is 249 weeks after his date of disposi-

tion, the term extends approximately 33 weeks beyond Bourgeois's 21st birthday. Bourgeois appeals.

## I

Bourgeois contends that a disposition order imposing a term of confinement beyond the juvenile's 21st birthday exceeds the court's jurisdiction under the Juvenile Justice Act of 1977, RCW 13.40.

■■ The act provides, in pertinent part, as follows:

> In no case may a juvenile offender be committed by the juvenile court to the department of social and health services for placement in a juvenile correctional institution beyond the juvenile offender's twenty-first birthday.

RCW 13.40.300(1). The State concedes that the term of confinement (*i.e.*, the maximum term) extends beyond Bourgeois's 21st birthday. The State nonetheless contends that this statute "does not prohibit a *sentence* beyond age twenty-one, rather it prohibits *commitment* beyond age twenty-one." According to the State, RCW 13.40.300(1) merely prohibits the extension of jurisdiction beyond a juvenile offender's 21st birthday, thus requiring "automatic release of a respondent upon his or her twenty-first birthday".

The State's interpretation is problematic. First, it ignores the plain meaning of the verb "commit". Commit, in the sense here at issue, is defined as "[t]o send a person to prison by virtue of a lawful authority, for any crime . . . by authority of a court". Black's Law Dictionary 248 (5th ed. 1979); *see also Webster's Third New International Dictionary* 457 (1986) ("to place in or send officially to confinement or other place of punishment . . . : sentence to punishment"). Thus, interpreted according to the foregoing definitions, the word "commit" would delineate the outer limit of the court's sentencing *authority* rather than the outer limit of permissible *confinement*.

However, Bourgeois's proffered interpretation is even less rational and leads to unintended and absurd results. Clearly, the statute contemplates that juvenile offenders may be confined for terms extending up to the age of 21. But the inter-

pretation urged by Bourgeois would make it impossible for a judge to effect such a sentence. Juvenile offenders can be released after they have served only the minimum term, which, in manifest injustice cases where the maximum is more than 1 year, "may be no less than eighty percent of the maximum term in the range." RCW 13.40.030(2)(c).[4] Thus, as a practical matter, no disposition could be fashioned that would surely confine a juvenile offender through his or her 21st birthday, even if the juvenile court deems that to be the appropriate sentence. This is so because, under the interpretation proffered by Bourgeois, the 21st birthday represents a ceiling on *maximum* terms; hence, the minimum term (and therefore the possible or likely release date) would necessarily be set at some earlier point.

An even more absurd result flows from Bourgeois's interpretation: a juvenile court judge would not be permitted to impose the applicable *standard range* sentence when it extended beyond a juvenile offender's 21st birthday. In fact such is the case here: taking into account credit for time served, the standard range maximum, imposed consecutively on each count, would have extended approximately 3 weeks beyond Bourgeois's 21st birthday. Certainly the Legislature did not intend to preclude the sentencing judge from imposing a standard range in such a case. Nor can we infer that a juvenile court is compelled to impose a *downward* manifest injustice departure where the facts of the case otherwise fail to justify such a sentence. *See State v. Theroff*, 33 Wn. App. 741, 744, 657 P.2d 800 ("trial court's sentencing authority is limited to that expressly found in the statutes"), *review denied*, 99 Wn.2d 1015 (1983). "Unlikely, absurd or strained consequences resulting from a literal reading [of a statutory term] should be avoided." *State v. McDougal*, 120 Wn.2d 334, 350, 841 P.2d 1232 (1992). A literal interpretation of RCW 13.40-

---

[4]If the term of confinement exceeds 30 days, then the trial judge sentences the juvenile to a "maximum term". RCW 13.40.160(1). This maximum term is expressly subject to the provisions of RCW 13.40.030(2) for purposes of determining "the range".

.300(1) leads to results that the Legislature could not have intended. We believe the Legislature assumed that juvenile offenders would simply be released at age 21 regardless of the term of confinement imposed at disposition.

The Supreme Court's opinion in *State v. Furman*, 122 Wn.2d 440, 858 P.2d 1092 (1993) supports this analysis. In *Furman*, a juvenile was charged with aggravated first degree murder based on an incident that occurred 2 months before the juvenile's 18th birthday. The Supreme Court upheld the juvenile court's decision to decline jurisdiction, noting that if appellant had been tried as a juvenile, then under RCW 13.40.300(1) "he could have been *confined* only for the 3 years remaining until his 21st birthday. He could not, therefore, *have served* even the juvenile standard range penalty for the offense." (Footnote omitted. Italics ours.) 122 Wn.2d at 448.

While the *Furman* court was not faced with the issue presented here, it seems to have assumed that RCW 13.40-.300(1) represents a limit on the authority to confine a juvenile rather than a limit on the juvenile court's ability to enter a disposition. This result avoids an interpretation of the statute that would require juvenile courts to impose sentences that are not contemplated by the Juvenile Justice Act of 1977 (JJA).

We conclude, therefore, that a juvenile court may enter a disposition setting a maximum term of confinement beyond the offender's 21st birthday. Thus, in this respect the lower court did not err.

## II

Next Bourgeois contends that, in reaching its manifest injustice finding and disposition, the juvenile court erred by improperly considering two aggravating factors: the possibility of early release and the severity of the victims' injuries. He does not challenge the trial court's reliance on future dangerousness or the need for drug and alcohol treatment.

First, Bourgeois challenges the trial court's consideration of the fact that DJR has and would likely exercise the authority to release him after he had served only the minimum term in the standard range. Bourgeois relies on three cases, decided in the context of the Sentencing Reform Act of 1981 (SRA), that have disapproved consideration by the sentencing judge of potential earned early release time in fashioning exceptional sentences. *See State v. Fisher*, 108 Wn.2d 419, 739 P.2d 683 (1987); *State v. Gutierrez*, 58 Wn. App. 70, 78-79, 791 P.2d 275 (1990); *State v. Crutchfield*, 53 Wn. App. 916, 930-31, 771 P.2d 746 (1989), *overruled on other grounds in State v. Chadderton*, 119 Wn.2d 390, 832 P.2d 481 (1992).

In *Fisher*, as here, the trial court expressly based its imposition of an exceptional sentence on its assumption that defendant would behave while confined and, therefore, that defendant would be eligible for release after serving less than the maximum standard range sentence. The sentencing court was of the opinion that, viewed in the light of the severity of the defendant's offenses, this sentence was not enough time.

In reviewing whether the reasons given by the trial court were adequate grounds for an exceptional sentence, the Supreme Court admonished the trial court as follows:

> To the extent that the judge relied on this reasoning to impose [an] exceptional sentence[], such reliance was improper. The framework of the SRA indicates that earned early release time is to be considered only after the offender has begun serving his sentence. Moreover, it would be inappropriate to impose a sentence outside the presumptive range based on an entirely speculative prediction of the likely behavior of an offender while in confinement.

(Citation omitted.) 108 Wn.2d at 429 n.6;[5] *accord Crutchfield*, 53 Wn. App. at 931 (invalidating the availability of good time credit as a reason justifying exceptional sentence)

---

[5]The *Fisher* court nevertheless held that another substantial and compelling reason provided an adequate justification for the exceptional sentence.

(citing *Fisher*); *Gutierrez*, 58 Wn. App. at 78 (in imposing exceptional sentence, trial court erred in "considering the possibility and probability of good time credit") (citing *Fisher*; *Crutchfield*).

The State contends that these cases are distinguishable because the sentences were imposed under the SRA, not the JJA. According to the State, the purposes of the SRA and the JJA are different. However, the State's comparison of the general purposes of the two acts fails to establish that the particular holdings of *Fisher* and its progeny are inconsistent with any particular purpose of the JJA.

In *Fisher*, the Supreme Court expressed two reasons for prohibiting the sentencing judge from considering earned early release in imposing an exceptional sentence: (1) the fact that the framework of the SRA indicates that earned early release time is to be considered only after the offender has begun serving the sentence, and (2) because it would be unfair to impose a sentence outside the standard range based on speculative predictions about the likely behavior of the offender while in confinement. 108 Wn.2d at 429 n.6; 58 Wn. App. at 78.

These reasons apply with equal force in the juvenile context. First, the JJA specifically delegates to the Secretary of the Department of Social and Health Services the authority to set release or discharge dates for juvenile offenders "within the prescribed range to which a juvenile has been committed." RCW 13.40.210(1). The release date must be determined "prior to the expiration of sixty percent of a juvenile's minimum term of confinement." RCW 13.40.210(1).

The Legislature plainly vested the Department of Social and Health Services with the discretionary authority to determine a juvenile offender's release date in accordance with procedures promulgated by the Department. As in the adult sentencing context, when a juvenile court considers the possibility of an administrative early release decision, it usurps the Department's statutory authority.

Second, none of the purposes of the JJA suggest that the sentencing judge ought to engage in speculative predictions

about the likely behavior of a juvenile offender while in confinement. Such conjecture is equally inappropriate in the juvenile context.[6]

We conclude that the juvenile court erred by considering the possibility that Bourgeois could be released after serving a minimum term as a basis for finding a manifest injustice.[7]

Next, Bourgeois contends the juvenile court erred by considering the severity of the victims' injuries as a reason for imposing a manifest injustice disposition. Bourgeois argues that the injuries inhered in the charged crime of first degree assault.

■ In general, the severity of the injury sustained by a victim can support a decision to depart from a standard range sentence "if [the injuries] are significantly more serious than in the usual case." *State v. Tunell*, 51 Wn. App. 274, 279, 753 P.2d 543 (citing *State v. Ratliff*, 46 Wn. App. 466, 469-70, 731 P.2d 1114 (1987)), *review denied*, 110 Wn.2d 1036 (1988), *overruled in part on other grounds in State v. Batista*, 116 Wn.2d 777, 788, 808 P.2d 1141 (1991); *see also State v. George*, 67 Wn. App. 217, 222, 834 P.2d 664 (1992), *review denied*, 120 Wn.2d 1023 (1993).[8] But the seriousness of the victim's injuries cannot be used to depart from the standard range "if that factor has been considered in defin-

---

[6]Even assuming, as the State contends, that a juvenile is *presumptively* entitled to minimum term release (a fact unsupported by any evidence in the record), consideration of this factor still requires the sentencing judge to engage in speculation, *i.e.*, that the juvenile offender will not behave in such an egregious manner as to lose eligibility.

[7]Although Bourgeois has not expressly challenged the sentence length as clearly excessive, the length of an exceptional disposition must have a "tenable basis". *State v. S.S.*, 67 Wn. App. 800, 819, 840 P.2d 891 (1992). If sentence length is fixed based on improper consideration of potential early release, then it rests on an untenable basis. *See State v. Ross*, 71 Wn. App. 556, 573 n.9, 861 P.2d 473 (1993) (trial court may not rely on "impermissible reasons such as the availability of good time or a general dissatisfaction with the applicable standard range sentence to determine the length of a sentence").

[8]Although *Tunell* and *George* were decided in the adult sentencing context, neither party argues that the analysis therein is inapplicable in juvenile proceedings.

ing the crime itself." *Tunell*, 51 Wn. App. at 279; *George*, 67 Wn. App. at 222. Bourgeois contends that in this case the effects on the victims were no more serious than in the usual case of first degree assault.

Bourgeois was charged with and convicted of first degree assault based on the infliction of "great bodily harm" upon the victim. RCW 9A.36.011(1)(c).[9] "Great bodily harm" is defined as

> bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ[.]

RCW 9A.04.110(4)(c). The trial court concluded that because first degree assault can hypothetically be committed without inflicting any injury whatsoever, the injuries actually inflicted were more severe than the minimum injuries that could have led to the same conviction. We believe that this approach avoids the relevant question: did the Legislature contemplate the injuries actually inflicted in defining, and setting the standard range for, the crime of conviction?

We conclude that the wounds inflicted on the victims here were not "particularly egregious" because they fall within the scope of the statutory definition of the crime. In fact the injuries inflicted were exemplars of what the Legislature defined as an intentional assault inflicting great bodily injury. The juvenile court found that the injuries "were capable of causing death" and that one of the victims "lost his spleen, half his pancreas and had a colostomy". The Legislature has defined bodily injury to include "bodily injury which creates a probability of death or, . . . which causes a significant permanent loss or impairment of the function of any bodily part or organ". RCW 9A.04.110(4)(c). The injuries here unambiguously fall within the definition of the crime.

By contrast, the defendants in *George* punched a 77-year-old woman in the face three times, and then, after holding

---

[9]Bourgeois was also charged and convicted based on an alternative means of committing the offense: assault committed with a "deadly weapon", RCW 9A.36-.011(1)(a).

her down for 15 minutes and robbing her, they beat the victim in the head five or six times with the stock of a rifle and punched her again. The force used in striking the victim with the rifle was great enough to break the rifle. The victim's skull was fractured and she suffered permanent brain damage; she was left in a semivegetative state, unable to engage in meaningful communication with others. 67 Wn. App. at 220.

This court held that the trial court had not erred in considering the severity of the victim's injuries in setting an exceptional sentence for the crime of first degree assault:

> We reject the notion . . . that the harm inflicted was not far greater than necessary to establish the crime. Under the statutory definition, loss of a foot, for example, would qualify as great bodily injury. Here, the assault was such as to relegate the victim to a semivegetative state, an injury far more serious than that necessary to qualify as first degree assault. . . .

67 Wn. App. at 223.

Significantly, the *George* court felt obliged to distinguish *State v. Nordby*, 106 Wn.2d 514, 723 P.2d 1117 (1986), in which the court held that the seriousness of a victim's injuries (two severely broken legs, a broken arm, extreme pain, and a lapse into coma) could not be considered in imposing an exceptional sentence for vehicular assault. The *Nordby* court declined to consider the severity of the injuries as an aggravating factor because "serious injury" is necessary to establish vehicular assault. 106 Wn.2d at 519.

The panel in *George* reasoned that the "seriousness of the injuries [in *Nordby*] was not atypical of a person who has been struck by an automobile, whereas here, the seriousness and permanence of the injuries resulted from the deliberate and gratuitous violence of the assault." 67 Wn. App. at 223 n.3.

In the present case, it cannot be said that the injuries inflicted were "far greater than necessary" to establish the crime of first degree assault. The gunshot wounds were not atypical of injuries inflicted by firearms, and the record does not demonstrate the sort of "deliberate and gratuitous violence" present in *George*.

We conclude that the juvenile court erred in considering the severity of the victims' injuries as a factor supporting the manifest injustice determination.

 Although we invalidate two of the aggravating factors relied upon in this case, the State contends that the disposition can be affirmed nonetheless because it is clear that the juvenile court would impose the same sentence based upon other valid aggravating factors. We disagree. A remand for resentencing is necessary because, as is clear from a review of its oral findings and opinion, the trial court placed "significant weight" on the inappropriate factors in departing from a standard range disposition. *See State v. Collins*, 69 Wn. App. 110, 115, 847 P.2d 528 (1993) (quoting *State v. Post*, 118 Wn.2d 596, 616, 826 P.2d 172 (1992)).

We vacate the disposition and remand for a disposition consistent with this opinion.

SCHOLFIELD and COLEMAN, JJ., concur.