[No. 32656–2–I.   Division One.   June 10, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. JEREMIAH BOURGEOIS, *Appellant*.

---

[41]*State v. Coria*, 120 Wn.2d 156, 171, 839 P.2d 890 (1992).

[42]*See* RCW 18.165.010 *et. seq.*

*Washington Appellate Project*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Tami A. Perdue, Deputy*, for respondent.

BECKER, J. — Evidence meant to enhance the credibility of a witness is irrelevant when the credibility of the witness has not been attacked. In this aggravated first degree murder case the State, in the absence of an attack, fortified key witnesses by showing they were afraid to testify.

The undue emphasis placed on their fear prejudiced the defendant. An incident of spectator misconduct reinforced the prejudice. We conclude the defendant did not have a fair trial, and reverse.

## I.

Dagnew Andemichael, Tecle Ghebremichaele, and Efrem Isak owned and operated the High Point Market, a small grocery store in West Seattle. Jeremiah Bourgeois, age 14, and his brother Bernard, age 16, frequented the store. Bernard Bourgeois shot and badly wounded Andemichael and Ghebremichaele on January 5, 1992.[1] The two victims testified for the State at Bernard's juvenile adjudication in May 1992. At 3:15 p.m. on May 19, the court found Bernard guilty of two counts of first degree assault.

About four and a half hours after the court announced its decision in Bernard's case, someone entered the High Point Market and fired several shots, killing Ghebremichaele and wounding Efrem Isak. A witness, Frank Rojas, said that shortly before the killing, he saw a person he believed to be Jeremiah Bourgeois walking toward the Market with a bandanna over his face. When Rojas heard gunshots several seconds later, he looked up and saw the same person standing in the doorway of the Market. Two other witnesses saw a person who generally matched Jeremiah's description near the entry to the store at the time of the shooting.

The State charged Jeremiah Bourgeois with first degree murder and first degree assault. The juvenile court declined jurisdiction. In adult court, the State amended the information to charge aggravated first degree murder, alleging that Jeremiah shot the two store owners in retaliation and revenge for testifying against Bernard in the earlier trial.

At trial, the State began direct examination of its first

---

[1]*See State v. Bourgeois*, 72 Wn. App. 650, 866 P.2d 43 (1994).

witness, Dagnew Andemichael, by asking, "Mr. Andemichael, do you want to be here today?" Over objection, the State elicited that Andemichael had to be arrested and brought to trial on a material witness warrant because he was afraid to testify. The defendant moved for a mistrial, arguing the testimony was irrelevant and prejudicial. In denying the motion, the court accepted the State's assertion that its questions went to the credibility of the witness.

The State took the same approach with later witnesses, asking them on direct examination to relate their fear and reluctance to testify. Frank Rojas, responding to the question "Why don't you want to be here?" said he was "Fearful of getting hurt, my family being hurt." The court admitted all such testimony as relevant to an assessment of the witnesses' credibility.

At the beginning of the State's direct examination of one witness, Debra Steward, the State elicited that several weeks before trial, while leaving a party, she was pushed to the floor by someone who said, "Don't do it, Debbie." Steward testified, over objection, that this incident made her fearful about coming to court.

Steward testified that several days after the shooting, Jeremiah came to her house and offered money to her and her son if they would say he had been at their house babysitting on the night in question. While Steward was on the witness stand, one of the jurors noticed two teenage spectators glaring at Steward and "kind of staring her down". The juror watched as one of the boys made a gesture as if to shoot Steward with a gun. The judge and attorneys, engaged in a sidebar conference, were unaware of what was happening. The juror assumed the young men were friends of Jeremiah because he later saw them sitting with Jeremiah's girlfriend in the hall. The juror reported the incident to the bailiff. The bailiff informed the judge in chambers that a juror was concerned about a spectator who was glaring at the witness. The judge did not inform counsel or take any other action during the trial.

The fact that various witnesses testified despite fear of retaliation was a central theme of the State's closing remarks. The prosecutor began:

> Ladies and gentlemen of the jury, the essence of this case on which you have heard evidence for approximately three weeks can be distilled to just a few words: deadly retaliation and reasonable fear of more of it. If you doubt whether or not that's an accurate distillation, consider the following: consider the fact that Dagnew Andemichael had to be threatened with a material witness warrant to get him to come here to testify.

The court overruled a defense objection, and the prosecutor continued:

> Consider as well Efrem Isak who had to, in fact, be arrested on material witness warrant and threatened with remaining in jail before he would testify.
>
> Consider Debra Steward, who was so fearful she did not want to admit in open court that she was fearful because she understood that she had been pushed down recently when leaving a party apparently just one-to-two weeks before she testified.

After further defense objection, the prosecutor told the jury that the witnesses' fear of testifying should be considered only in the context of their credibility.

The jury found Bourgeois guilty of aggravated first degree murder and first degree assault. The murder conviction carried with it a mandatory minimum sentence of life in prison without parole.[2]

At the time of sentencing, having learned post-verdict that the spectator misconduct involved a gun-pointing gesture, the judge put the incident on the record. Bourgeois moved for a new trial on the basis of spectator misconduct, juror misconduct, and an improper ex-parte communication between the juror and the court. The juror who had sent the message to the judge testified at a post-trial hearing. He said he had mentioned the threatening gesture once to another juror and again during jury deliberations;

---

[2] RCW 10.95.030.

the other juror testified that he, too, had become aware of a general "air of intimidation" in the courtroom. None of the other jurors recalled seeing or hearing about any inappropriate spectator activity. The court denied the motion for a mistrial, concluding the spectator's conduct did not have any impact on the jury's verdict.

## II.

We first consider whether the court erred in admitting testimony and argument concerning the fear and intimidation felt by State witnesses.

Evidence that a defendant has threatened witnesses in order to influence their testimony is generally relevant to prove guilty knowledge.[3] Here, there was no evidence linking Bourgeois to threats against any of the State witnesses. Accordingly, as the trial court recognized, their fearfulness and reluctance to testify was not relevant to establish his guilt. The court admitted the evidence concerning the witnesses' fears as relevant to the limited purpose of helping the jury to assess their credibility.

Evidence intended to fortify or corroborate the credibility of a witness is admissible only after the credibility of the witness has been put at issue by an attack from the opposing party.[4] In the absence of an attack upon credibility no sustaining evidence is allowed.[5] Here, the State's first question to its first witness was designed to elicit testimony that the witness was afraid to testify and had to be brought to court against his will. Manifestly, Bourgeois had not at that point put anyone's credibility in issue.

In some situations, the credibility of a witness may be

[3]*State v. Kosanke*, 23 Wn.2d 211, 215, 160 P.2d 541 (1945); *State v. McGhee*, 57 Wn. App. 457, 460-61, 788 P.2d 603, *review denied*, 115 Wn.2d 1013 (1990).

[4]*State v. Froehlich*, 96 Wn.2d 301, 635 P.2d 127 (1981).

[5]E. CLEARY, MCCORMICK ON EVIDENCE § 47, at 172 (4th ed. 1992).

an "inevitable, central issue" in the case.[6] The credibility of Dagnew Andemichael and Efrem Isak was not an inevitable issue in this case. Indeed, it was not an issue at all. These witnesses could not describe the shooter, and Bourgeois never attacked their credibility.

The only defense challenge to Debra Steward's testimony focused on her admission that she had consumed six to ten beers and "had a little buzz" at the time when Bourgeois talked to her about giving him an alibi. Cross–examination on this narrow issue did not, even in retrospect, give relevance to Steward's fear of being in court. "The rehabilitating facts must meet a particular method of impeachment with relative directness. The wall, attacked at one point, may not be fortified at another and distinct point."[7]

■ The only fearful witness attacked by the defense as having a motive to lie was Frank Rojas. When first contacted by police, Rojas gave them a false name. When shown a photographic lineup, he did not immediately identify Jeremiah as the person he had seen outside the market. In later conversations with the police, Rojas did make a positive identification of Jeremiah. On cross examination of Rojas, Bourgeois tried to show that Rojas was not sure who he saw but that the police used outstanding warrants for his arrest to pressure him into placing Jeremiah at the scene. This line of attack may have justified the State in showing that Rojas' reluctance to identify Jeremiah was due to fear, not uncertainty. But the attack on the credibility of this one witness did not warrant a comprehensive fortification of all witnesses.

The State claims credibility was inherently at issue because each fearful witness, like Rojas, had a motive to "minimize" Bourgeois' involvement. The State used this

---

[6]*State v. Petrich*, 101 Wn.2d 566, 575, 683 P.2d 173 (1984); *see also United States v. Arroyo–Angulo*, 580 F.2d 1137, 1146–47 (2d Cir.), *cert. denied*, 439 U.S. 913 (1978).

[7]McCORMICK § 47, at 174; *see State v. Harper*, 35 Wn. App. 855, 858, 670 P.2d 296 (1983), *review denied*, 100 Wn.2d 1035 (1984).

rationale at trial to unfair advantage. The witnesses' fear became a ready explanation for any uncertainty, any equivocation in their testimony. The State's closing argument illustrates the tactic. Referring to Debra Steward, the prosecutor argued:

> So, if anything, you would expect her to minimize. And that perhaps explains, and also perhaps with the passage of time, why she said she couldn't recall who specifically first brought up the idea of her being his alibi.

Referring to the State's witnesses in general, the prosecutor asked:

> Who can blame any of these persons for being terrified? They have every motive—and that's the whole point of this— every motive to come in here and conceal or try to minimize what they saw or what they observed, and, further, not be as certain as they once were as to everything they had observed.

The unspoken message was that witnesses like Debra Steward would be more impressive if they were not afraid. The effect was to inoculate those witnesses against cross-examination.

Again, the rule is that a party cannot bolster the credibility of a witness absent an attack. When the credibility of a witness is not at issue, efforts to make that witness appear especially credible are at best distracting and at worst, as in the present case, prejudicial. We conclude that the court erred in permitting the State's witnesses to testify that they were afraid to be in court.

The court similarly erred in overruling defense objections to the State's closing argument. The prosecutor began: "The essence of this case . . . can be distilled to just a few words: deadly retaliation and *reasonable fear of more of it.*" (Emphasis added.) Over repeated objection the State asked the jurors to consider that Andemichael, Isak, Steward, and Rojas all were afraid to testify. In rebuttal, the State returned to the theme:

> Do you think you can infer anything but fear from the fact

the State had to obtain material witness warrants or threaten any individuals to come in here on material witness warrants? One of the allegations the State has to prove in this case is that it involved retaliation against someone for just being a witness in a former proceeding.

Put yourself in those witnesses' places and imagine what you would be like when you're being told you have to come in[,] under court order or you might go to jail[,] and testify in a similar situation where you indeed would become a witness as well.

The State's argument exacerbated the court's error in admitting the fear testimony. Jeremiah was charged with the retaliatory shooting of Ghebremichaele and Isak. He was not charged with intimidating or threatening the witnesses at his trial. That the witnesses against him feared retaliation was not an issue in the case. Argument distilling the case to "reasonable fear of more [retaliation]" encouraged the jury to convict Jeremiah based on emotion and fear, rather than evidence linking him to the charged crime.

In summary, the testimony concerning fears and threats against State witnesses was irrelevant. Admitting this emotional evidence and permitting the State to argue it was error.

We next consider whether the error is grounds for reversal. The State maintains that the evidence against Bourgeois was "overwhelming" and that the jury would have convicted him regardless of any trial errors.

■ A conviction should not be set aside for insubstantial errors.[8] A defendant is not entitled to a perfect trial.[9] In the case of evidentiary error the proper inquiry is whether, within reasonable probabilities, the outcome of

---

[8]*State v. Martin*, 73 Wn.2d 616, 627, 440 P.2d 429 (1968), *cert. denied*, 393 U.S. 1081 (1969).

[9]*State v. Miles*, 73 Wn.2d 67, 70, 436 P.2d 198 (1968).

the trial would have been materially affected had the error not occurred.[10] While the evidence against Bourgeois was strong, its strength depended upon the credibility of the State's witnesses. It cannot be ignored that the fear evidence improperly bolstered the credibility of those witnesses.

The trial court instructed the jury to consider fear only in connection with credibility and not for any other purpose. The court should not have allowed the jury to consider fear at all. By explicitly allowing the jury to consider fear in assessing the credibility of the witnesses, the instruction contributed to the bolstering problem. And we are not persuaded that the prejudicial inference from the fear evidence could be contained by a limiting instruction in any event.[11] The State introduced and argued fear of retaliation as the theme of its case. The fearful witnesses were allowed to convey their belief that Jeremiah was a violent person, capable of retaliation. Guided by the State's argument, the jury could hardly avoid coming to the same conclusion. Showing that witnesses believed Jeremiah capable of violence was not proper proof that he committed the charged crime.[12]

The final measure of error in a criminal trial is whether the defendant was afforded a fair trial.[13] "A trial in which irrelevant and inflammatory matter is introduced, which has a natural tendency to prejudice the jury against the accused, is not a fair trial."[14] Here, the irrelevant and inflammatory references to fear, threats and intimidation permeated the entire trial. It is not our function to

---

[10]*State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986).

[11]*See Miles*, 73 Wn.2d at 70–71; *State v. Parr*, 93 Wn.2d 95, 107, 606 P.2d 263 (1980).

[12]*See* ER 404(b).

[13]*State v. Green*, 71 Wn.2d 372, 373, 428 P.2d 540 (1967); *Miles*, 73 Wn.2d at 70.

[14]*Miles*, 73 Wn.2d at 70.

reweigh the remaining evidence and attempt to determine guilt or innocence.[15]

The error in this case was substantial. We cannot say with confidence that the outcome of the trial was unaffected. We conclude that Bourgeois did not have a fair trial.

## III.

An additional basis for reversal is the court's failure to inform the parties of the communication it received from the juror.

■ As a rule, there should be no communication between the court and the jury in the absence of the defendant.[16] When a juror initiates an ex parte contact with the judge relating to some aspect of the trial, the trial court "generally should disclose the communication to counsel for all parties."[17]

At the time the court learned that a juror had expressed concern about a spectator glaring at Debra Steward, jurors had already heard several witnesses, including Steward, testify about their fear of being on the witness stand. The court was aware of the defendant's concern about the prejudicial tendency of such testimony. The juror's message should have alerted the court to the possibility of a serious problem requiring consultation with the parties.

Failure to disclose a juror communication is an error that may rise to constitutional dimensions because it infringes on the defendant's right to be present at all critical stages of trial and the right to counsel.[18] But the com-

---

[15]*See Kotteakos v. United States*, 328 U.S. 750, 763, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946) ("it is not the appellate court's function to . . . speculate upon probable reconviction and decide according to how the speculation comes out.").

[16]*State v. Caliguri*, 99 Wn.2d 501, 508, 664 P.2d 466 (1983).

[17]*Rushen v. Spain*, 464 U.S. 114, 119, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).

[18]*State v. Rice*, 110 Wn.2d 577, 613, 757 P.2d 889 (1988), *cert. denied*, 491 U.S. 910 (1989); *Rushen*, 464 U.S. at 117.

munication may be so inconsequential as to be harmless error. As the United States Supreme Court explained in *Rushen v. Spain,* "There is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial."[19]

Once the defendant has raised the possibility of prejudice, the State has the burden of proving the communication harmless beyond a reasonable doubt.[20] At the post–trial hearing in the present case, Bourgeois raised a possibility of prejudice by showing that at least one juror believed Jeremiah's friends were trying to intimidate Debra Steward.

The State contends the post–trial hearing proved that such prejudice did not occur because the juror testified that the spectator's conduct did not have any effect on his verdict. We do not consider testimony concerning the jurors' mental processes in reaching a verdict because these facts inhere in the verdict.[21] The pertinent question is whether the juror's observation, and Bourgeois' inability to take curative steps at the time it occurred, could reasonably have affected the jury's determination.[22] In assessing the prejudicial impact of error, we must take into consideration the entire record.[23] Thus a similar but isolated incident of spectator misconduct might be viewed as having less impact than here, where retaliation against witnesses was a central element of the State's case and the jurors had been made acutely conscious of witnesses being fearful.

The State argues that the defendant, if he had become

[19]*Rushen,* 464 U.S. at 118.

[20]*Caliguri,* 99 Wn.2d at 509.

[21]*State v. Briggs,* 55 Wn. App. 44, 776 P.2d 1347 (1989); *Gardner v. Malone,* 60 Wn.2d 836, 841–43, 376 P.2d 651, 379 P.2d 918 (1962).

[22]*See Briggs,* 55 Wn. App. at 55.

[23]*State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429 (1968), *cert. denied,* 393 U.S. 1081 (1969).

aware of the spectator's intimidating conduct during trial, would have decided to do nothing rather than risk intrusive measures that might highlight and exaggerate the effect of the incident. Bourgeois maintains that had he been informed of the communication, he could have immediately questioned the juror concerning what he saw. He could have requested the court to replace the juror with an alternate, or to admonish the jury not to consider spectators' behavior in reaching its verdict.[24] These curative steps were possible and realistic. They cannot be dismissed as strategically unlikely.

Given the context in which the gun–pointing gesture occurred, we cannot be certain it did not affect the determination of the one or two jurors who were aware of it. The conduct of the spectator vividly confirmed that the witnesses had reason to be fearful of giving testimony against Jeremiah. In contrast to the juror's recollection of an unrelated crime in *Rushen v. Spain*,[25] here the juror observed people who were apparently linked to the defendant threatening witnesses against the defendant. Bourgeois had no opportunity at voir dire to discover the potentially biasing effect of this information upon the jury.[26]

We conclude the court erred in failing to inform the parties of the juror's communication, and that the State has not carried its burden of proving the error harmless beyond a reasonable doubt.

Reversed and remanded for a new trial.

The remainder of this opinion has no precedential value and will not be published.[27]

---

[24]*See United States v. Hernandez*, 952 F.2d 1110, 1116–18 (9th Cir. 1991), *cert. denied*, 506 U.S. 920 (1992).

[25]*Rushen v. Spain*, 464 U.S. at 115–16.

[26]*Cf. Rushen*, 464 U.S. at 127–28 (Stevens, J., concurring).

[27]*See* RCW 2.06.040; CAR 14.

BAKER, C.J., and GROSSE, J., concur.

Review granted at 130 Wn.2d 1008 (1996).