7 P.3d 839 (2000)
102 Wash.App. 357
STATE of Washington, Respondent,
v.
David Paul OGDEN, B.D. 03-02-84, Appellant.
No. 44578-2-I.
Court of Appeals of Washington, Division 1.
September 5, 2000.
Reconsideration Denied November 13, 2000.
*841 Eric Broman, Eric Nielsen, Seattle, for Appellant.
Andrea Ruth Vitalich, King County Pros. Atty., Seattle, for Respondent.
*840 KENNEDY, J.
A juvenile court adjudicated fourteen-year-old David Ogden guilty of first degree felony murder for robbing and killing a homeless man. Ogden hit the man over the head with a skateboard eight times, knocking him to the ground, and then stabbed him multiple times while the man was immobilized. The man bled to death. Ogden also took money from the man; inflicted lacerations, contusions, and abrasions on his forehead, eyebrow, and the back of his shoulder; and carved an incision on his right upper eyelid. The juvenile court found that a standard range disposition would be a manifest injustice because of the heinous, cruel, and depraved nature of the crime; the particularly vulnerable victim; and the threat Ogden would pose to the community if he did not receive extended treatment. It then ordered Ogden to confinement for the maximum term, which is less than seven years. Ogden appeals his disposition, contending that the court's stated reasons are not supported by the record and that the disposition is clearly excessive.
*842 The heinous, cruel, and depraved nature of the crime aggravating factor focuses on the conduct of the juvenile rather than exclusively on the pain and suffering of the victim. In this case, regardless of whether the unconscious man actually suffered during Ogden's numerous acts of stabbing and carving, the record contains substantial evidence to support this finding, based on the fact that Ogden inflicted these gratuitous injuries. The court's particular vulnerability finding is also supported by the record, regardless of the fact that the man was not particularly vulnerable when Ogden's attack began. Ogden's actions in this case are indistinguishable from the actions of a perpetrator who finds a person lying on the ground immobilized, and then seizes the opportunity to rob and stab the person to death, knowing that the victim is unable to resist. In addition, the record contains substantial evidence to support the juvenile court's finding that Ogden presents a threat to the community without extended services. And finally, in light of these aggravating factors, the length of Ogden's disposition has a tenable basis in the record. We therefore affirm Ogden's disposition.

FACTS
During the afternoon of June 12, 1998, fifty-year-old Andres Lapusanwho was a homeless day laborerpurchased a fifth of vodka and two or three miniature bottles of whiskey from a liquor store in Seattle's Queen Anne neighborhood. Lapusan paid for his purchases with a $20 bill from a "wad of money[.]" Report of Proceedings (3/10/99) at 314. That evening, fourteen-year-old David Ogdenwho had run away from home three days earliermet Lapusan in Queen Anne's Kinnear Park and the two drank liquor together. Although Ogden and Lapusan looked intoxicated, persons who saw them together stated that the interactions between Ogden and Lapusan appeared to be friendly and non-threatening.
Later that evening, Lapusan was found dead with his empty pants pockets turned inside-out and his empty wallet lying on the ground nearby. He had sustained approximately sixteen blunt-force injuries to his head, and several stab wounds to his chest, torso, and calf. Some of these stab woundswhich were inflicted while Lapusan was alivepenetrated Lapusan's heart and liver, causing him to bleed to death. The doctor who performed the autopsy on Lapusan's body opined that Lapusan "probably wasn't moving when all of these [stab wounds] were inflicted." Report of Proceedings (3/12/99) at 718. The doctor also noted that Lapusan's body lacked any serious defense wounds. Lapusan's body also contained lacerations, contusions, and abrasions on his forehead, eyebrow, and the back of his shoulder. And there was an incision carved on Lapusan's right upper eyelid. All of these injuries were inflicted near the time of Lapusan's death.
According to Odgen's friends, a few days after Lapusan's body was found, Ogden claimed that "a bum" in the park had made sexual advances toward him in an attempt to rape him. In response, Ogden said that he hit "the bum" over the head with a skateboard eight times, knocking him to the ground. Ogden then claimed that he took a knife and money from "the bum," and then stabbed him with the knife. During a consent-search of Ogden's property, police discovered a skateboard and a knife that both contained blood stains consistent with Lapusan's blood.
On June 24, 1998, the State charged Ogden with first degree felony-murder, alleging that Ogden caused Lapusan's death in the course of and in furtherance of the crime of first degree robbery. A decline hearing was held. After hearing testimony from a clinical psychologist and a probation counselor regarding, inter alia, Ogden's need for treatment, the judge asked the probation counselor if the services available at juvenile institutions were superior to those available at the Department of Corrections. The probation counselor responded affirmatively and the judge decided to retain Ogden in the juvenile system, explaining that Ogden was "a kid who needs services that wouldn't get the services in the adult system that could very well go to prison for 20 years, have his needs unmet, come out and be just as much a risk to the public[.]" Report of Proceedings (9/11/98) at 111.
*843 After a fact-finding hearing, the juvenile court adjudicated Ogden guilty as charged. The court then found that a standard range disposition of 180 to 224 weeks in confinement would be a manifest injustice because of the heinous, cruel, and depraved nature of the crime; the particularly vulnerable victim; and the threat that Ogden would pose to the community if he did not receive extended treatment. It therefore ordered Ogden to confinement for the maximum term, i.e., until he reaches the age of twenty-one years. Ogden appeals his disposition.

DISCUSSION
Ogden contends that the juvenile court erred by imposing a maximum-term manifest injustice disposition because the court's stated reasons are not supported by the record and because the disposition is clearly excessive.
The juvenile court may impose a disposition in excess of the standard range only if the court determines that the imposition of a standard range disposition "would effectuate a manifest injustice[.]" RCW 13.40.160(2). "`Manifest injustice' means a disposition that... would impose a serious, and clear danger to society in light of the purposes of [the Juvenile Justice Act of 1977.]" RCW 13.40.020(17). RCW 13.40.230(2) sets forth the standard for reviewing a juvenile disposition outside the standard range:
To uphold a disposition outside the standard range, the court of appeals must find (a) that the reasons supplied by the disposition judge are supported by the record which was before the judge and that those reasons clearly and convincingly support the conclusion that a disposition within the range would constitute a manifest injustice, and (b) that the sentence imposed was neither clearly excessive nor clearly too lenient.
A. The Heinous, Cruel, and Depraved Nature of the Crime
The heinous, cruel, and depraved nature of the crime is a statutory aggravating factor under the Juvenile Justice Act. RCW 13.40.150(i)(ii). It therefore clearly and convincingly supports the conclusion that a disposition within the standard range would constitute a manifest injustice. Nonetheless, Ogden maintains that this finding is not supported by the record. Specifically, he argues that this factor is invalid because it inheres in the offense of first degree felony-murder. Ogden also argues that the nature of his crime was not heinous, cruel, and depraved because "the victim did not suffer." Appellant's Reply Br. at 4.
1. Factors That Inhere in the Crime
In determining whether to impose a disposition outside the standard range, the juvenile court must consider all factors except aggravating factors that inhere in the offense. State v. Gutierrez, 37 Wash.App. 910, 913, 684 P.2d 87 (1984). In this case, the juvenile court adjudicated Ogden guilty of first degree felony-murder because he caused Lapusan's death in the course of or in furtherance of first degree robbery, or in immediate flight therefrom. See RCW 9A.32.010(1)(c). The record indicates that Ogden committed first degree robbery by unlawfully taking money from Lapusan's person by inflicting bodily injury upon him. See RCW 9A.56.190, -.200.
Ogden hit Lapusan on the head at least eight and as many as sixteen times; took money out of his pocket; stabbed him at least six times in his chest, torso, and calf; inflicted lacerations, contusions, and abrasions on Lapusan's forehead, eyebrow, and the back of his shoulder; and carved an incision on his right upper eyelid. Ogden certainly could have committed the offense i.e., he could have unlawfully taken money from Lapusan's person by inflicting bodily injury upon him and causing his death without hitting and stabbing him multiple times and carving upon his body gratuitously. This extreme degree of ferocity does not inhere in the offense of first degree felony-murder based on first degree robbery.
2. Substantial Evidence in the Record
The Juvenile Justice Act instructs the juvenile court to hold a dispositional hearing to consider, inter alia, whether the juvenile's *844 "offense was committed in an especially heinous, cruel, or depraved manner[,]" before entering a dispositional order. RCW 13.40.150(3)(i)(ii). A crime is heinous, cruel, and depraved only if the heinousness, cruelty, and depravity of the particular crime go "beyond what could be said to be part of any act of [that type of crime]." State v. Payne, 58 Wash.App. 215, 220, 795 P.2d 134, 805 P.2d 247 (1990).
As an initial matter, we note that the heinous, cruel, and depraved nature of the crime juvenile aggravating factor is not necessarily the same as the adult aggravating factor of deliberate cruelty to the victim under the Sentencing Reform Act. See RCW 9.94A.390(2)(a) (authorizing an adult sentencing court to depart from a standard range sentence where the "defendant's conduct ... manifested deliberate cruelty to the victim"). That the Legislature used different words for the juvenile aggravating factor indicates that it intended the juvenile aggravating factor to encompass something more than or different from deliberate cruelty to the victim. Moreover, unlike the Sentencing Reform Act, the Juvenile Justice Act purports to respond to the needs of offenders and "`attempts to tread an equatorial line somewhere midway between the poles of rehabilitation and retribution[.]'" State v. T.C., 99 Wash.App. 701, 707, 995 P.2d 98 (2000) (citation omitted). Thus, the focus of the heinous, cruel, and depraved nature of the crime aggravating factor is on the conduct of the juvenile rather than exclusively on the pain and suffering of the victim.
In this case, Ogden stabbed Lapusan at least six times, causing him to bleed to death. He also inflicted lacerations, contusions, and abrasions on Lapusan's forehead, eyebrow, and the back of his shoulder, and carved an incision on his right upper eyelid. Regardless of whether these numerous injuries actually caused the unconscious Lapusan to suffer, a finding of heinous, cruel, and depraved is not limited to deliberate cruelty in the sense of causing the victim undue pain and suffering. For example, even carving on a dead body is heinous, cruel, and depravedsurvivors will suffer needless shock, and society will recoil, even though the deceased will feel no pain. Thus, whether the victim is unconscious and may feel no pain is not controlling. We decline to say that if a person is dead or unconscious he or she can be carved upon with impunity, whether by a juvenile or an adult. The State is not necessarily required to prove that the victim actually suffered pain to support a finding of heinous, cruel, and depraved. Indeed, in this case, there is no evidence in the record to indicate how much pain Lapusan felt and no evidence to indicate how soon after the first stab Lapusan actually died. Nonetheless, the record contains substantial evidence to support the juvenile court's finding that the nature of the crime was heinous, cruel, and depraved because Ogden inflicted these injuries on Lapusan.
B. Particularly Vulnerable Victim
Particular vulnerability of the victim is a statutory agravating factor that clearly and convincingly supports the conclusion that a disposition within the standard range would constitute a manifest injustice. RCW 13.40.150(i)(iii). Ogden argues, however, that the juvenile court's finding that Lapusan was particularly vulnerable is not supported by the record because Lapusan was not particularly vulnerable before Ogden hit him. Indeed, the juvenile court acknowledged that Lapusan was not particularly vulnerable when Ogden's attack began. Nonetheless, it found that Lapusan became particularly vulnerable after Ogden hit him over the head numerous times, which was before Ogden stabbed him: "[O]nce [Ogden] hit Mr. Lapusan on the head numerous times, Mr. Lapusan was essentially unconscious and unable to protect himself in any way, or flee, and therefore was totally vulnerable." Clerk's Papers at 149-50.
"When analyzing particular vulnerability, the focus is on the victim. The court determines if the victim is more vulnerable to the offense than other victims and if the defendant knew of that vulnerability." State v. Bedker, 74 Wash.App. 87, 94, 871 P.2d 673 (1994). The "type of vulnerability contemplated by the [aggravating factors listed in the Juvenile Justice Act] is extreme youth, advanced age, or physical or mental infirmity." *845 State v. Wall, 46 Wash.App. 218, 220, 729 P.2d 656 (1986). Similarly, the Sentencing Reform Act authorizes trial courts to base an aggravating factor on a finding that the "defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance due to extreme youth, advanced age, disability, or ill health." RCW 9.94A.390(2)(b); see Wall, 46 Wash.App. at 222, 729 P.2d 656 (concluding that "the same definition of vulnerability is contemplated in both the juvenile and the adult sentencing schemes"). Although "particularly vulnerable victim" is not defined in either the Juvenile Justice Act or the Sentencing Reform Act, this court has rejected the argument that particularly vulnerable means capable of or susceptible to being wounded or hurt as by a weapon because applying this definition would seriously dilute the significance of a finding of particular vulnerability as a basis for imposition of sentences beyond the standard range. Wall, 46 Wash.App. at 221, 729 P.2d 656.
Typically, cases addressing particularly vulnerable victim as an aggravating factor involve victims who are particularly vulnerable before the attack began. See, e.g., State v. Jacobsen, 95 Wash.App. 967, 979-80, 977 P.2d 1250 (1999) (concluding that a five-year old victim was particularly vulnerable); Scott, 72 Wash.App. at 217, 866 P.2d 1258 (concluding that a 78-year old victim who suffered from Alzheimer's disease was particularly vulnerable). Nonetheless, some of the cases affirming particularly vulnerable victim aggravating factor findings involve victims who are unable to resist or avoid the criminal act due to other circumstances. See, e.g., State v. Cardenas, 129 Wash.2d 1, 10-11, 914 P.2d 57 (1996) (concluding that pedestrian victim of vehicular homicide was particularly vulnerable); State v. Ross, 71 Wash.App. 556, 565-66, 861 P.2d 473 (1993), 71 Wash.App. 556, 883 P.2d 329 (1994) (concluding that women alone in offices open to the public are particularly vulnerable); State v. Hicks, 61 Wash.App. 923, 931, 812 P.2d 893 (1991) (concluding that sleeping victims are particularly vulnerable).
In this case, Lapusan was not particularly vulnerable because of his age, or because of any physical or mental infirmities before the attack began. But after Ogden hit him on the head numerous times rendering him unconscious, Lapusanunlike other victims was unable to resist or avoid being stabbed and robbed, and Ogden knew this. This court has affirmed a finding that a victim "was unconscious and therefore particularly vulnerable at the time of her disfiguring injuries" where, as here, the victim was vulnerable only because of injuries the victim sustained during the perpetrator's attack. State v. Baird, 83 Wash.App. 477, 480, 922 P.2d 157 (1996); see also id. at 488-89, 922 P.2d 157. According to Lapusan's autopsy, Lapusan "probably wasn't moving when all of these [stab wounds] were inflicted." Report of Proceedings (3/12/99) at 718. From the facts in the record for this case, one could reasonably infer that after Ogden hit Lapusan over the head numerous times, he fell to the ground and lay helplessly while Ogden robbed him, stabbed him at least six times on his chest, torso, and calf; inflicted lacerations, contusions, and abrasions on his forehead, eyebrow, and the back of his shoulder; and carved an incision on his right upper eyelid. Ogden's actions in this case are indistinguishable from the actions of a perpetrator who finds a person lying on the ground immobilized, and seizes the opportunity to rob and stab the person to death, knowing that the victim is unable to resist.
Nonetheless, Ogden argueswithout citation to authoritythat a particularly vulnerable victim finding is appropriate only if there is a temporal break between the assault and the stabbing, i.e., if these were two crimes rather than one continuous crime. But this argument is contrary to the Baird case, in which this court noted that "a victim beaten unconscious and then further assaulted is surely no less vulnerable than a sleeping victim." Baird, 83 Wash.App. at 489, 922 P.2d 157. In that case, Tom Baird hit his wife with lead-lined leather gloves a few times, knocking her unconscious, and then systematically cut off her eyelids and sliced off her nose. Id. at 480-81, 922 P.2d 157. This court affirmed the trial court's particularly vulnerable victim finding, notwithstanding *846 the fact that there was no evidence of a temporal break between the time Baird hit his wife and the time he cut her. Id. at 489, 922 P.2d 157. Following Baird, we reject Ogden's argument that Lapusan was not particularly vulnerable simply because it was he, Ogden, who caused Lapusan's vulnerability by beating him into unconsciousness.
Next, Ogden argues that affirming the juvenile court's particularly vulnerable victim finding in this case would lead to manifest injustice dispositions and exceptional sentences in every case where the perpetrator strikes the victim more than once. We reject this argument. Certainly, a victim who receives multiple blows to the head and then endures subsequent cuttings while he or she is immobilizedlike the victims in Baird and in this caseis more vulnerable than a victim who receives multiple blows but who is not thereby rendered totally helpless to defend himself or herself from further injury. Although the latter victim may be more vulnerable than other victims after he or she receives the first blow, his or her status does not rise to the level of a "particularly vulnerable victim" by mere virtue of enduring multiple strikes. Whether a victim is a "particularly vulnerable victim" will depend on the facts of each case. Indeed, by leaving the decision to the court's discretion, subject of course to appellate review, rather than creating a bright-line distinction, we avoid diluting the significance of a finding of particular vulnerability as a basis for imposition of sentences beyond the standard range. See Wall, 46 Wash.App. at 221, 729 P.2d 656. In the meantime, we soundly reject the premise that an assailant who beats a victim into unconsciousness thereby rendering him or her totally helpless, and then takes advantage of that helplessness to inflict gratuitous additional injuries is not subject to a finding by the sentencing court that an exceptional sentence upward or a manifest injustice disposition is warranted based on particular vulnerability of the victim.
In this case, we conclude that the particularly vulnerable victim aggravating factor is supported by the record.
C. Threat To The Community and Protection of Society
If a juvenile offender presents a threat to the community, this is an aggravating factor that clearly and convincingly supports a juvenile court's conclusion that a disposition within the standard range would constitute a manifest injustice. State v. N.E., 70 Wash.App. 602, 605, 854 P.2d 672 (1993). In this case, Ogden maintains that this finding is too speculative because there is "no proposed plan or course of treatment from the state or the probation counselor." Appellant's Br. at 28. He also asserts that this finding is not supported by evidence in the record.
"The concept of `treatment' under the [Juvenile Justice Act] is not limited to any particular form[.]" State v. J.N., 64 Wash.App. 112, 117, 823 P.2d 1128 (1992). "[I]n certain circumstances, the `structured and disciplined environment of detention' may itself be beneficial and thus responsive to the current needs of a juvenile offender." Id. (citation omitted). We therefore reject Ogden's argument that the State was required to present a specific course of treatment other than or in addition to confinement to an institution. Moreover, the record reflects that, after interviewing Ogden, Clinical Psychologist Dr. Kenneth Asher opined that Ogden "is a very, very suggestible young person ... [and] a very strong candidate for suggestion of all sorts[,] [including a suggestion] to commit a crime[.]" Report of Proceedings (9/11/98) at 58. Dr. Asher also stated, "[Ogden] had just a smattering of appropriate therapeutic and psychologically based services and as far as we know, these didn't do that much good up to that point." Id. at 56-57. Dr. Asher opined that Ogden needed much more intensive treatment. Likewise, Ogden's probation counselor opined that he needed mental health services. In addition, the judge who decided to retain Ogden in the juvenile system did so only after acknowledging Ogden's need for extended treatment for the purpose of reducing his risk to the public and the superiority of the services available at juvenile institutions as compared to the Department of Corrections. We conclude that the *847 record contains substantial evidence to support the juvenile court's finding that Ogden presents a threat to the community without extended services.
D. Clearly Excessive Disposition
Once a juvenile court has a legal and factual basis on which to depart from the standard range, it has broad discretion to determine the length of a manifest injustice disposition. State v. Duncan, 90 Wash.App. 808, 815, 960 P.2d 941, review denied, 136 Wash.2d 1015, 966 P.2d 1278 (1998). The length of a manifest injustice disposition must have a "tenable basis" in the record. State v. Bourgeois, 72 Wash.App. 650, 661 n. 7, 866 P.2d 43 (1994). In other words, appellate courts will find that "a sentence is excessive only when it cannot be justified by any reasonable view which may be taken of the record." State v. M.L., 134 Wash.2d 657, 660, 952 P.2d 187 (1998). Nonetheless, regardless of the length of their disposition, juveniles must be released from confinement at age twenty-one. RCW 13.40.300; see also Bourgeois, 72 Wash.App. at 658, 866 P.2d 43.
In this case, the standard range disposition for Ogden was 180 to 224 weeks in confinement. The juvenile court ordered Ogden, who was fourteen years old when he killed Lapusan on June 12, 1998, to confinement until he turns twenty-one on March 2, 2005. Ogden maintains that this court should reverse his disposition because the juvenile court failed to justify the length of the sentence. But our Supreme Court has held in the context of an adult exceptional sentence that there is no requirement that the sentencing court state reasons for the length of an exceptional sentence because the statute does not contain such a requirement. State v. Ritchie, 126 Wash.2d 388, 392, 894 P.2d 1308 (1995). Likewise, the Juvenile Justice Act does not require juvenile courts to state reasons for the length of manifest injustice dispositions. See RCW 13.40.160(2); see also Bourgeois, 72 Wash.App. at 657, 866 P.2d 43 (explaining that the disposition court's authority is limited to that expressly found in the statutes). Following Ritchie, we conclude that a juvenile court is not required to articulate a justification for the length of a manifest injustice disposition. See Ritchie, 126 Wash.2d at 392, 894 P.2d 1308. We therefore reject Ogden's argument.
Moreover, Ogden's disposition which is less than seven yearshas a tenable basis in the record, in light of the heinous, cruel, and depraved nature of the crime; the particularly vulnerable victim; and the threat that Ogden would pose to the community if he did not receive extended treatment in a juvenile institution. We therefore conclude that the juvenile court did not abuse its discretion when it ordered Ogden to confinement until he reaches the age of twenty-one.
We affirm Ogden's manifest injustice disposition.
COLEMAN, J., and GROSSE, J., concur.