67 P.3d 518 (2003)
STATE of Washington, Respondent,
v.
E.A.J., a minor, Appellant.
No. 49890-8-I.
Court of Appeals of Washington, Division 1.
April 21, 2003.
Reconsideration Denied June 4, 2003.
*520 Gregory C. Link, Wa. Appellate Project, Seattle, WA, for Appellant.
Thomas M. Curtis, Snohomish Co. Pros. Atty Office, Everett, WA, for Respondent.
*519 KENNEDY, J.
Fourteen-year old E.A.J. and the State of Washington entered into a plea agreement on December 5, 2001. E.A.J. entered an Alford[1] plea to single counts of first degree rape, second degree assault, and unlawful imprisonmentcrimes that he was charged with having committed the previous March, about 10 weeks before his 14th birthday. The State agreed to reduce an initial charge of first degree kidnapping to unlawful imprisonment, and to recommend a manifest injustice disposition, stated as follows: "The Probation Department is asking for a [manifest injustice] to approximately age 20 and the State will support that request." Clerk's Papers at 34.
It is unclear from the record when the parties actually received the Probation Department's Manifest Injustice Report, but the record establishes that the report was filed with the court on the same day as the disposition hearing, some six weeks after the plea hearing. The Probation Department in fact recommended that E.A.J. be committed until his 21st birthday.
At the disposition hearing, the State indicated that it was supporting the Probation Department's request, but also asked the court to impose confinement for 364 weeks, with credit for time served. If the disposition court had followed the 364-week recommendation, E.A.J. would have been entitled to release on or about the 7th anniversary of the crimes, some 10 weeks before his 21st birthday. But the disposition court instead committed E.A.J. to the custody of the Juvenile Rehabilitation Administration (JRA) for a total of 374 weeksto E.A.J.'s 21st birthdaywith credit for 271 days already served in detention, in accord with the recommendation of the Probation Department.[2] The disposition court also noted that the JRA could elect to place E.A.J. on parole for a year or more, prior to his 21st birthday, and provided in the Disposition Order: "In no case shall this commitment extend past respondent's 21st birthday." Clerk's Papers at 11.
E.A.J. did not contend at the disposition hearing that the State had failed to honor its plea agreement with him. He never sought to withdraw his Alford plea at the trial court level, on that or any other basis. He contends for the first time on appeal that the State violated the plea agreement and that, as a result, he is entitled to reversal of his manifest injustice disposition and to a remand to the trial court for a new disposition hearing before a different judge in order to permit his choice of remedy: withdrawal of the Alford plea or specific enforcement of the plea agreement.
The State denies having breached the plea agreement. In its response to E.A.J.'s motion for accelerated review of the manifest injustice disposition, the State contends that by recommending commitment for 364 weeks with credit for time served, it complied with the plea agreement, in that if the court had accepted that recommendation, E.A.J. would be entitled to release from confinement 10 weeks before his 21st birthday, at which time he would still be "approximately age 20," rather than age 21. At oral argument for this appeal, the State suggested a slightly different theorythat the State did not breach its plea agreement because the agreement was couched from the start in terms that the State would support the Probation Department's recommendationwhich the parties believed at the time would be a recommendation *521 for confinement "to approximately age 20" but which in fact turned out to be a recommendation for confinement to age 21.
Whether the State breached its plea agreement with E.A.J. depends on what the parties actually agreed to. We cannot determine this from the record on appeal. The only written record of the agreement itself, which is quoted above, is found in Paragraph 3 of E.A.J.'s Statement of Juvenile on Plea of Guilty. As stated there, the agreement is patently ambiguous. Not only is the phrase "to approximately age 20" ambiguous on its face, but the agreement as a whole is subject to at least three interpretations, each of which seems to us to be equally reasonable. The judge who accepted the plea interpreted the agreement to be that the State would recommend confinement "up to age 20."[3] Neither party corrected that court's interpretation. But by that same token, E.A.J. did not protest, at the disposition hearing (where a different judge presided), when the State recommended confinement for 364 weeks, by which recommendation, E.A.J. would be entitled to release some 10 weeks before his 21st birthday at a time when he will still be age 20. E.A.J.'s lack of protest at the disposition hearing could indicate that E.A.J. believed that the State had kept its plea agreement as E.A.J. actually understood the agreement. Or, to the extent that the State indicated its support of the Probation Department's recommendation, both in the plea agreement and at the disposition hearing, E.A.J.'s failure to protest could indicate that the parties understood all along that the State would support the Probation Department's recommendation, which could only be approximated at the time of the plea agreement in that the Manifest Injustice Report was not yet completed.
A plea agreement is a contract, and is to be analyzed in accord with contract principles. State v. Sledge, 133 Wash.2d 828, 838-39, 947 P.2d 1199 (1997). A contract is not subject to specific performance "unless the precise act sought to be compelled is clearly ascertainable." Emrich v. Connell, 105 Wash.2d 551, 558, 716 P.2d 863 (1986). A contract provision is ambiguous when its terms are uncertain or when its terms are capable of being understood as having more than one meaning. Martinez v. Miller Indus., Inc., 94 Wash.App. 935, 944, 974 P.2d 1261 (1999). Additionally, a "promise" may be illusory because it is so indefinite that it cannot be enforced, or because provisions contained in the promise make its performance optional or entirely discretionary on the part of the promisor. Spooner v. Reserve Life Ins. Co., 47 Wash.2d 454, 458, 287 P.2d 735 (1955).
But "when a plea rests in any significant degree on a promise or agreement of the prosecutor ... such promise must be fulfilled." Santobello v. New York, 404 U.S. 257, 263, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). This is because a plea agreement includes a waiver by the defendant of several important constitutional rights. Sledge, 133 Wash.2d at 838-39, n. 6, 947 P.2d 1199. Where the State breaches a plea agreement, the breach "undercuts the basis for the waiver of constitutional rights implicit in the plea." State v. Tourtellotte, 88 Wash.2d 579, 584, 564 P.2d 799 (1977).
An alleged breach of a plea agreement by the State is an issue of constitutional magnitude that can be raised for the first time on appeal. State v. Sanchez, 146 Wash.2d 339, 345-46, 46 P.3d 774 (2002). But where the interpretation of an integrated contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence, *522 interpretation of the contract is a question of fact that must be determined by the trial court. Berg v. Hudesman, 115 Wash.2d 657, 668, 801 P.2d 222 (1990) (adopting Restatement (Second) of Contracts §§ 212, 214(c)).[4] That is the situation here. E.A.J. certainly has not waived the issue by failing to raise it in the trial court, but his failure to have done so makes it impossible for us to review his claim. Appellate courts are not fact-finders.
Accordingly, we remand this matter to the trial court for an evidentiary hearing with respect to the parties' intentions and the interpretation of the plea agreement in this case. Once the trial court interprets the parties' contract, it should be able to determine whether or not the State breached the plea agreement, and we direct that the trial court make such determination, based on such evidence as the parties may present and the principles of Berg and its progeny.
If the court determines that the State did breach its agreement, E.A.J.'s conviction cannot stand. Sledge, 133 Wash.2d at 839-40, 947 P.2d 1199. In that event, the remedy will be a new disposition hearing before a different judge from the one who entered the disposition in this case, to permit E.A.J. his choice of remedywithdrawal of his Alford plea, or specific performance of the plea agreement.[5] And, of course, if the court determines that the State did not breach its plea agreement, E.A.J.'s conviction will stand.
E.A.J. also contends that he is entitled to a new disposition hearing in any event because the trial court erred in considering the first two of the five aggravating factors that the court relied upon in imposing the manifest injustice disposition in this case, namely, that in committing the offense, E.A.J. inflicted serious bodily injury upon the victim, and that the offense was committed in an especially heinous, cruel, or depraved manner.[6] E.A.J. contends that the "infliction of serious bodily harm" aggravating factor inheres in the second degree assault conviction based on the same injury, and that the "cruel, heinous, or depraved" aggravating factor is unconstitutionally vague. In order to address these issues, we must turn to the facts that gave rise to the charges.
On March 19, 2001, E.A.J. happened upon 5-year-old A.R., a neighbor child who knew and trusted him. After asking A.R. for help in finding some keys that E.A.J. had lost earlier that day, he took her to the enclosed backyard of a vacant house. Once there, E.A.J. put A.R. under a tree, placed one hand on A.R.'s neck, and choked her until she passed out and lost control of her bodily functions. He then pulled down A.R.'s pants and underpants, and put his finger into her vagina. E.A.J. then got on his bike and headed for home, leaving the child under the tree.
A.R.'s mother, who was frantically looking for her by then, came upon E.A.J. as he left the vacant house. She asked him if he had seen A.R., and E.A.J. said that he had not. *523 Shortly thereafter, A.R.'s mother sighted A.R. walking toward their home. The child was muddy, bloody, and crying. A.R. told her mother that E.A.J. had thrown her down under a tree, choked her, pulled her pants down, and spanked her. Asked why she had not screamed, A.R. said that E.A.J. made her "fall asleep."
A.R. was taken to the hospital for an examination. She had a large amount of blood, as well as feces and urine on her underpants, petecheal hemorrhaging, scratches on her face, a scratch on her chin, red marks and petechea on the left side of her neck and collar area, cuts or cracks on her lips, and bite marks on her tongue. A colposcopic examination revealed that the child's hymen was red and swollen, with a small abrasion on its right side.
After the examination, A.R. was placed in clean clothing and taken home. The clothing that she was wearing at the time of the attack was taken into evidence by police. A.R.'s mother reported that the clean panties that A.R. wore home from the hospital had blood on them the next morning.
E.A.J. was arrested the following day, March 20, 2001. After some initial dissembling, he gave police a statement that essentially corroborated what A.R. had told her mother. He told police that he thought he had killed A.R. by choking her to death, and that when he thought she was dead, he penetrated A.R.'s vagina with his finger. He also said that he had not been angry with A.R. Rather, he had been angry with his grandfather, and he "just snapped." E.A.J. was some 10 weeks shy of his 14th birthday at the time of these crimes.
The State charged E.A.J. with first degree rape of a child, second degree assault, and first degree kidnapping. Following plea negotiations, the State reduced the kidnapping charge to unlawful imprisonment, and E.A.J. entered an Alford plea to first degree rape of a child, second degree assault, and unlawful imprisonment. He remained in custody until the disposition hearing, which was held on January 16, 2002.
At the disposition hearing, clinical psychologist Dr. Robin LaDue, who had performed a psychological evaluation of E.A.J. during his detention, testified for the defense that E.A.J.'s family history, intellectual ability, and behavior raised significant questions about whether he suffered from Fetal Alcohol Syndrome or Fetal Alcohol Related Conditions. She also testified that E.A.J. needed extensive treatment for his behavioral problems and sexual offense, and would continue to need that treatment well beyond the age of 21, but that she thought, based on factors such as his level of expressed remorse and understanding of his offense, that he would be amenable to treatment. She also thought that there were ways that he could obtain the necessary therapy and support in the community, while still ensuring community safety, and that community treatment was a better option than confined treatment because, ultimately, E.A.J. would be returned to the community.
Other information before the court included a report from E.A.J.'s school stating that E.A.J. had an anger management problem, a diagnostic report from JRA stating that E.A.J. needs anger management treatment, sex offender treatment, and other services, and a Manifest Injustice Report from the Probation Department in which the Probation Counselor recommended that E.A.J. be confined for treatment until his 21st birthday. E.A.J.'s grandmother, who had raised him in her home from the time that he was in diapers, told the court that she was unable to provide E.A.J. with adequate supervision at home, due to her own health problems, and that although D.S.H.S. had provided some counseling services for E.A.J. over the years, none of it had been particularly helpful. E.A.J.'s mother told the court that she just wanted her son to get treatment. The Probation Counselor testified that although E.A.J. had never been diagnosed, it was clear that he had mental health issues. She also testified that as a mitigating factor, E.A.J. had no criminal history, although he had failed to follow through with a recent diversion plan. E.A.J. indicated to the court, through counsel, that he did not wish to address the court.
By its failure to address E.A.J.'s contention that the first aggravating factor *524 that in the commission of the offense, E.A.J. inflicted serious bodily injury upon A.R., the State apparently concedes the issue. The second degree assault charge contained in the information alleges that E.A.J. intentionally assaulted A.R. thereby recklessly inflicting serious bodily harm. In its oral decision, the court found as an aggravating factor that E.A.J. inflicted serious bodily harm by choking A.R. until she became unconscious and lost control of her bodily functions. The court made no finding that these injuries were more serious than typical for a second degree assault.
Accordingly, the State's apparent concession of error is well-taken. The court may not rely on factors necessarily considered by the Legislature in defining the standard range, or which inhere in the charged crime. State v. Ogden, 102 Wash.App. 357, 363, 7 P.3d 839 (2000), review denied, 143 Wash.2d 1012, 21 P.3d 291 (2001). Here, the injuries caused when E.A.J. choked A.R. not only inhere in the second degree assault charge, but they also provide the basis for that charge. Although E.A.J. also inflicted serious injuries upon A.R. in the course of the rapethe child's torn hymen was still bleeding the following morningthat injury does not appear, from the oral decision, to have been the basis of the first aggravating factor.
E.A.J. challenges the constitutionality of the second aggravating factorthat E.A.J. committed the rape in an especially heinous, cruel or depraved manner. The disposition court based this aggravating factor on the fact that the rape occurred after E.A.J. believed that A.R. was dead.
The especially heinous, cruel or depraved nature of the crime is a statutory aggravating factor under the Juvenile Justice Act. RCW 13.40.150(3)(h)(i)(ii). In State v. Rhodes, 92 Wash.2d 755, 759, 600 P.2d 1264 (1979) our Supreme Court stated that the constitutionally protected liberty interest created by the juvenile disposition standards is subject to the void-for-vagueness test. A statute is unconstitutionally vague if it fails to provide explicit standards to prevent arbitrary and discriminatory enforcement. Id. at 758, 600 P.2d 1264. The burden of proving that the statute is unconstitutionally vague falls upon E.A.J. Id. at 759, 600 P.2d 1264. E.A.J.'s challenge does not involve First Amendment rights. Therefore, "we evaluate the statute in light of the particular facts of each case. A party to whose conduct a statute clearly applies may not challenge it on the ground that it is vague as applied to the conduct of others." City of Seattle v. Abercrombie, 85 Wash.App. 393, 400, 945 P.2d 1132 (1997) (citation omitted).
E.A.J. contends that if the "heinous, cruel or depraved" aggravating factor was not already unconstitutionally vague, this court rendered it so in its opinion in State v. Ogden where we said that "the focus of the heinous, cruel and depraved nature of the crime aggravating factor is on the conduct of the juvenile rather than exclusively on the pain and suffering of the victim." Ogden, 102 Wash.App. at 365, 7 P.3d 839. E.A.J. contends that this ruling removed the minimal guidelines that prevent arbitrary and discriminatory enforcement. To support this conclusion, E.A.J. points to a series of United States Supreme Court death penalty cases.
In Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), overruled on other grounds by Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court upheld an Arizona statute that required the death penalty if the sentencing judge found that the murder was committed in an especially heinous, cruel or depraved manner, unless the judge also found sufficient mitigating circumstances to call for leniency. The high court noted that the Arizona Supreme Court had previously construed the "especially cruel" factor to mean that the victim had suffered mental anguish before his death, and that it had previously construed "especially depraved" to mean that the perpetrator had relished the murder, evidencing debasement or perversion. So construed, the high court decided that the aggravating circumstance provided sufficient guidance to the sentencing court to satisfy the Eighth and Fourteenth Amendments. Walton, 497 U.S. at 654-655, 110 S.Ct. 3047.
*525 In so ruling, the court distinguished Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) and Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In those two cases, the high court ruled that Oklahoma's "especially heinous, atrocious or cruel" aggravating factor and Georgia's "outrageously or wantonly vile, horrible or inhuman" aggravating factor, respectively, failed to pass constitutional muster because in those states, juries imposed the death penalty under instructions that contained only the bare statutory language, and because the reviewing courts in those states did not purport to apply any limiting definition of the aggravating factors to the facts presented. Walton, 497 U.S. at 652-53, 110 S.Ct. 3047.
We reject the notion that by ruling as we did in Ogden we opened the door to unbridled judicial discretion in determining whether a juvenile's conduct is especially heinous, cruel or depraved. To the contrary, we said in Ogden that "[a] crime is heinous, cruel, and depraved only if the heinousness, cruelty and depravity of the particular crime go `beyond what could be said to be part of any act of [that type of crime].'" Ogden, 102 Wash.App. at 364, 7 P.3d 839, quoting State v. Payne, 58 Wash.App. 215, 220, 795 P.2d 134 (1990), 805 P.2d 247. And we most certainly did not require courts to ignore any pain and suffering of the victim; we merely said that "the focus" of this aggravating factor "is on the conduct of the juvenile rather than exclusively on the pain and suffering of the victim." Id. at 365, 7 P.3d 839 (emphasis added here). Moreover, in reviewing the disposition court's ruling in Ogden, we applied the statutory language to the facts of that casenoting that in addition to stabbing the victim six times, causing him to bleed to death, the juvenile also inflicted lacerations, contusions and abrasions on the victim's body and carved an incision on the victim's eyelid. We concluded that although a dead man can feel no pain, "carving on a dead body is heinous, cruel, and depraved[.]" Id. at 365, 7 P.3d 839.
We should have also noted in Ogden, and we remedy that deficiency now, that the statute establishing this aggravating factor is written in the disjunctivethe disposition court must determine whether the "offense was committed in an especially heinous, cruel, or depraved manner[.]" RCW 13.40.150(3)(i)(ii) (emphasis added).
In Ogden, the offending juvenile didn't challenge the constitutionality of the statutory aggravating factor, but rather the sufficiency of the evidence to support the disposition court's application of the factor. Nothing in our ruling in Ogden undercuts the appropriate constitutional analysis however, and we continue to adhere to that ruling.
E.A.J.'s reliance on the death penalty cases is not analytically sound. As the United States Supreme Court has explained, "[c]laims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment" where the focus is on whether the challenged provision "fails to adequately inform juries what they must find to impose the death penalty and as a result leaves them and appellate courts with the kind of open-ended discretion which was held invalid in Furman v. Georgia, 408 U.S. 238, [92 S.Ct. 2726, 33 L.Ed.2d 346] (1972)." Maynard v. Cartwright, 486 U.S. at 361-62, 108 S.Ct. 1853. Vagueness challenges under the Due Process Clause, on the other hand, rest on lack of notice to the accused, "and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." Id. at 361, 108 S.Ct. 1853. See also Lockett v. Ohio, 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (legislatures remain free to decide how much discretion in sentencing should be reposed in the judge or jury in non-capital cases).
E.A.J. contends that the outcome of any void for vagueness challenge should be the same, regardless of its constitutional underpinnings. We disagree. We must evaluate a void for vagueness challenge based on the Due Process Clause in light of the particular facts of each case, and a party to whose conduct a statute clearly applies may not challenge it on the basis that it may be vague as applied to others. Abercrombie, 85 Wash.App. at 400, 945 P.2d 1132. Additionally, as *526 our Supreme Court pointed out in Rhodes, the Juvenile Justice Act contains numerous standards that prevent arbitrary and discriminatory application of the manifest injustice exception to the standard range. Although the Act has been considerably revised since Rhodes was decided, the Act still contains mitigating and aggravating factors that must be considered by the court in imposing a manifest injustice disposition. The very existence of these factors help to guide the court's discretion. Rhodes, 92 Wash.2d at 759, 600 P.2d 1264. "Moreover, the court is not limited to consideration of these factors. Evidence such as probation officers' reports and psychological and psychiatric studies is available to the court to assist it in determining whether a clear danger to society exists." Id. (citations omitted). Although the vagueness challenge in Rhodes was directed at the manifest injustice exception itself, and here the challenge is directed at only one of the statutory aggravating factors, the reasoning of Rhodes remains helpful.
We also note that it is in the course of appellate review of vagueness challenges such as this one that the common law evolvesand the common law also helps to guide trial court and appellate discretion.
Turning now to the facts of this case, the Maynard court stated that the test to be applied in addressing a Due Process vagueness challenge is whether reasonable persons would know that their conduct is at risk. Maynard, 486 U.S. at 361. Although E.A.J. states in his motion for accelerated review that he is not contending that he was denied notice that his conduct might result in a manifest injustice disposition, he is certainly challenging the alleged lack of objective guidelines to guide the court in enforcing the statute. We believe that trial and appellate judges are at least as reasonable as ordinary citizens. That being so, if an ordinary citizen can perceive that his conduct places him at risk, a court can likely perceive the same thing. We believe that any reasonable person would know that to commit an act of sexual penetration upon a dead person, or upon a person believed by the perpetrator to be dead, is heinous or depraved. Necrophilia is a depravity of the highest degreeand it is one that certainly does not inhere in the ordinary rape.
We review a trial court's determination that a person's conduct violates a particular aggravating factor under the "clearly erroneous" standard. State v. Wilson, 96 Wash.App. 382, 397, 980 P.2d 244 (1999). Such appellate review is another means by which arbitrary and discriminatory enforcement is discouraged. The disposition court's determination that E.A.J.'s rape of A.R., believing her to be dead, constituted especially heinous or depraved conduct, was not "clearly erroneous." Indeed, we think it was clearly correct. Whether the rape was also "cruel" in that A.R. was alive but unconscious and later thought that she had been "spanked" rather than rapedis beside the point. As we have already observed, the statutory aggravating factor here at issue is written in the disjunctive.
E.A.J.'s constitutional void for vagueness challenge fails.
Although we do not know at this juncture whether the court will determine, following our remand, that the State violated the plea agreement, judicial economy requires that we address the effect of the trial court's error with respect to the first aggravating factorthat E.A.J. inflicted serious injury upon A.R. in committing the second degree assault. We conclude that the court would impose the same manifest injustice disposition, even without that factor. The court's thorough and thoughtful oral decision reflects that considerable weight was placed upon the factor of victim vulnerability. The court found, based on the evidence, that five-year old A.R. was 3-feet 9-inches tall, and that she weighed 60 pounds. E.A.J., on the other hand, was 13 years old at the time of the crime, and stood 5-feet 8-inches tall, and weighed 130 pounds. Moreover, A.R. and E.A.J. were neighbors, and A.R. knew and trusted E.A.J.which is why she felt safe in helping him to look for the lost keys when he asked her to do so. These findings are unchallenged.
The court also found that, just 12 days earlier, E.A.J. had entered into a diversion *527 contract with respect to another offense. This finding is unchallenged.
Finally, the court placed considerable weight on the expert testimony that E.A.J. needs long-term treatment and supervision, and that he will continue to need such treatment and supervision even after he reached the age of 21. The court found E.A.J. to present "a serious danger to public safety. He is such a danger to the public safety that this Court does not believe that treatment in the community is appropriate or in the best interest of either the public or [E.A.J.]." Report of Proceedings at 78.
In sum, the court's oral decision leaves little if any doubt that the court would impose the same manifest injustice disposition if the erroneous factor had not been considered.
Accordingly, if the court determines, following our remand, that the State did not violate the plea agreement, we affirm E.A.J.'s manifest injustice disposition. But if the court determines that the State did violate the plea agreement, the court must provide E.A.J. with a new disposition hearing before a different judge, and permit such remedy as shall be consistent with this opinion and applicable law governing breach of plea agreements by prosecuting attorneys.
WE CONCUR: GROSSE, COLEMAN, JJ.
NOTES
[1] North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).
[2] E.A.J. had actually spent 301 days in detention, but the court imposed 30 days in detention for the unlawful imprisonment conviction.
[3] The judge who accepted E.A.J.'s Alford plea interpreted the plea agreement as follows:

THE COURT: The maximum punishment for these offenses would be confinement until you're twenty-one years old. Do you understand that?
[E.A.J.]: Yes.
THE COURT: And you also understand that the [S]tate is going to make a recommendation that you be confined up to age twenty. The defense may be arguing for something different. But you understand I can impose whatever sentence I think is appropriate. I don't have to follow anyone's recommendations?
[E.A.J.]: yes.
Report of Proceedings at 9.
[4] The parties have not discussed whether the plea agreement in this case is an integrated contract. To the extent that the prosecutor's promise may have been contingent upon the actual recommendation of the Probation Department, the agreement would appear not to have been fully integrated. But in either event, the "context rule" still applies. Berg, 115 Wash.2d at 669, 801 P.2d 222.
[5] There is an indication in the record that the 5-year-old complaining witness and her family may have moved out of state, or that the child may otherwise be unavailable to testify at trial. In that event, the court may limit E.A.J. to the remedy of specific performance. See State v. Miller, 110 Wash.2d 528, 535, 756 P.2d 122 (1988). We observe in passing that E.A.J. misunderstands the nature of the remedy of specific performance. He argues on appeal that he is entitled either to a standard range sentence, or at least to be released from confinement when he reaches the age of 20. This is incorrect. See State v. Henderson, 99 Wash.App. 369, 378, 993 P.2d 928 (2000) (holding that except in certain circumstances not seemingly here relevant, specific performance of a plea agreement only means that the prosecutor is required to recommend what he or she agreed to recommend, and the court has discretion to enter an appropriate disposition).
[6] The unchallenged aggravating factors are that the victim was especially vulnerable, that E.A.J. failed to comply with the conditions of a recent diversion agreement, and that the counselor indicated that E.A.J. needs treatment past the age of 21.